Rylie Evans
9612 East Dalton Road
Spokane, WA 99206
revans813@gmail.com
509-491-0946
Pro Se

U.S. COURTS

AUG 15 2018

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
NORTHERN DIVISION

**Rylie Evans,**

Plaintiff,

v.

**Sunshine Minting, Inc.**

Defendant.

Case no. 2:18-cv-359-BLW

**Complaint and
Jury Demand**

## PRELIMINARY STATEMENT

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2. Plaintiff, Ms. Rylie Evans, experienced escalating and unrelenting discrimination, harassment and a hostile work environment because of sex by employees, supervisors, and managers of Defendant Sunshine Minting, Inc. ("Sunshine"), as set forth below.

3. Plaintiff was subjected to retaliation because of her complaints to Defendant regarding the discrimination, harassment and hostile work environment because of sex that she experienced.

4. This severe and escalating discrimination, harassment, and retaliation included but was not limited to:

COMPLAINT (JURY DEMANDED)        1

a. Being intentionally referred to by male pronouns and titles with the purpose and effect of humiliating Ms. Evans;

b. Sexual harassment;

c. Disparaging comments and conduct;

d. Failure to correct her name in employment records and publicly accessible records and displays;

e. Hostility that impaired her access to the women's restroom and locker room;

f. Unfair discipline;

g. Repeated complaints to supervisors, management, and corporate headquarters that led to no prompt and effective corrective actions;

h. Retaliation from management;

i. Hostile work environment; and

j. Retaliatory hostile work environment.

## PARTIES

5. Plaintiff worked as an employee for Defendant Sunshine at facilities it operated in Coeur d'Alene, Idaho from June 2013 through November 18, 2014.

6. The unlawful employment practices alleged herein occurred in Coeur d'Alene, Idaho.

7. Defendant Sunshine, with a principal office address at 7600 Mineral Drive, Coeur d'Alene, Idaho, has continuously been doing business in the state of Idaho, and has continuously employed at least fifteen (15) employees.

8. Defendant Sunshine owns and operates facilities in Idaho, including the facility relevant to this lawsuit located at 750 W Canfield Ave, Coeur d'Alene, Idaho.

9. At all relevant times, Defendant Sunshine has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

10. Plaintiff resides in the State of Washington.

## PROCEDURAL HISTORY

11. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC" or "Commission") alleging violations of Title VII, including discrimination based on sex, disability, retaliation, hostile work environment, and retaliatory hostile work environment, by Defendant on or about March 12, 2015.

12. Upon information and belief, the EEOC provided Defendant with notice of the charges of discrimination.

13. The EEOC investigated the charges of discrimination.

14. On May 20, 2018, Plaintiff received a letter from the EEOC notifying her of her right to bring suit.

15. Plaintiff took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is based on Title VII of the Civil Rights Act and pursuant to 28 U.S.C. § 1337 because the action is based on a federal statute regulating commerce.

17. Venue is proper in the United States District Court for the District of Idaho pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the unlawful employment practices are alleged to have been committed within the jurisdiction of the District of Idaho.

18. Venue is proper pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices are alleged to have been committed within the jurisdiction of the District of Idaho.

## FACTS

19. Plaintiff, Ms. Rylie Evans is a female citizen of the United States.

20. Ms. Evans has a female gender identity.

21. Ms. Evans has a feminine gender expression.

22. Ms. Evans is a woman who is transgender.

**Sex, Gender, Gender Expression, and Gender Identity**

23. *Sex* is a term that includes gender, gender expression, and gender identity within its meaning.

24. *Sex stereotyping* refers to the application by an employer of stereotypes related to sex to restrict, disparage, or discriminate on the basis of an employee's gender expression or identity.

25. *Gender* refers to cultural expectations specific to the sexes.

26. *Gender expression* refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth.

27. *Gender identity* refers to a person's internal sense of sex, being male, female, or other.

28. Gender identity is intractably rooted at a very early age and cannot be changed.

29. *Transgender individuals* are people who have a gender identity that does not match the sex they were assigned at birth.

30. *Gender transition.* Transgender individuals often seek out legal, social, and medical means of aligning external manifestations of their sex and gender with their gender identity. This process is colloquially known as *gender transition* or *transition*.

31. Discrimination against transgender people for being transgender is based on their sex, sex stereotyping, gender, gender expression, gender identity, or gender transition.

32. It is appropriate to refer to a transgender woman who has transitioned with female titles, honorifics (e.g., Miss, Ms., or Mrs.), and pronouns (e.g., her, hers, and she).

**Employment with Sunshine**

33. In or about June 2013, Plaintiff was hired by Sunshine as a Quality Control Technician.

34. In or about February 2014, Plaintiff began living full-time as female outside of work.

35. Plaintiff delayed gender transition at work because disparaging slurs regarding the gender of transgender people were common in the workplace.

36. For example, one co-worker, in front Plaintiff and a supervisor, used the term "freak" regarding transgender people, and stated that they should not be permitted to be in public.

37. The Defendant took no action regarding this remark hostile to transgender people.

38. Another supervisor, in the presence of Plaintiff, referred to a gender non-conforming person as a "faggot" and "queer shemale."

39. By June 2014, Plaintiff's medical transition had proceeded to the point where she could no longer viably continue to present as male at work.

40. Plaintiff spoke to her supervisor about her upcoming gender transition at work.

41. The supervisor stated that she would face discrimination from other employees, and that the Defendant's environment was not friendly to transgender people.

42. Despite this knowledge of its hostile work environment, Defendant took no prompt and effective action to address the hostile work environment that Ms. Evans would shortly confront.

43. The supervisor also stated that he would not change Ms. Evans' name on company ID or records, and that she had to continue to have her old name and a male gender marker on company ID and records.

44. Plaintiff communicated with a representative of Defendant's Human Resources department regarding her upcoming gender transition at work.

45. She advised the representative that she had changed her gender marker on her Washington State driver's license.

COMPLAINT (JURY DEMANDED)				5

46. The representative advised that he would not change her gender on company records at that time.

47. The representative also refused to call Ms. Evans by her correct name, insisting on using the prior name she had used as a male.

48. The refusal of the supervisor and the HR representative to recognize Ms. Evans' gender was offensive to her, and would be offensive to any reasonable person.

49. After Ms. Evans transitioned on the job, she experienced verbal harassment, was constantly the subject of gossip, and was subjected to disparate treatment in the workplace.

50. For example, she routinely heard co-workers say disparaging things about transgender and gay people, which were openly voiced by and in front of supervisors and managers.

51. Slurs were also directed at Ms. Evans specifically in her presence.

52. Slurs uttered include, but are not limited to: "tranny", "he/she," "shemale," and "freak."

53. Many of her coworkers, immediate supervisors, and managers deliberately referred to her using the male gender.

54. For some employees, this was clearly an inadvertent error, and they would quickly correct themselves and apologize.

55. For the vast majority of these misgenderings, however, they continued despite Ms. Evans' frequent protests. The frequency of these misgenderings and the failure to apologize or show any remorse indicated that they were deliberately committed.

56. A rumor began that a supervisor and Ms. Evans were secretly dating and were having a sexual relationship, which was untrue.

57. Upon information and belief, the supervisor himself spread this rumor to attack Ms. Evans' character.

58. Female coworkers began to inappropriately comment on her breast size and ask intrusive questions.

59. Many coworkers asked inappropriate questions about Ms. Evans' bodily functions in the restroom.

60. These slurs, innuendos, inappropriate comments and questions, and misgenderings constituted harassment and a hostile work environment because of sex.

61. Because these slurs, innuendos, inappropriate comments and questions and misgenderings were uttered in front of and by supervisors and managers, Defendant was on notice of the harassment of Ms. Evans, and the hostile work environment directed against her.

62. The Defendant took no prompt or effective action to address this harassment and hostile work environment.

63. Defendant Sunshine's workplace policies did not offer Ms. Evans meaningful protection from the kind of hostilities at issue.

64. Defendant did not maintain policies that expressly prohibited discrimination against persons such as Ms. Evans in the workplace.

65. Defendant Sunshine did not meaningfully enforce its policies.

66. In or around Summer 2014, Ms. Evans was approached by a co-worker, Debbie Williams who said that she took "great joy" in making other employees uncomfortable with Ms. Evans' gender transition.

67. She said she enjoyed asking other employees inappropriate questions about Ms. Evans.

68. Ms. Evans advised her it was inappropriate to discuss her gender transition, or to ask inappropriate trans-related questions of other employees.

69. The co-worker asked Ms. Evans what kinds of questions were inappropriate.

COMPLAINT (JURY DEMANDED)                 7

70. Ms. Evans gave her examples of inappropriate questions, such as those concerning her anatomy, medical procedures, restroom usage, and dating/sexual life, among others.

71. Ms. Evans advised that she had kept a list of the inappropriate questions she had been asked in order to gather evidence of her harassment and the hostile work environment.

72. Thinking that showing the co-worker the list might help her better understand Ms. Evans' concerns, she handed the co-worker the list and explained how the questions were inappropriate and hurtful.

73. The co-worker then took the list and fled the room without Ms. Evans' permission.

74. The list was never returned to Ms. Evans.

75. In October 2014, Ms. Evans requested a locker in the female locker room.

76. Lockers were vitally important to the check-in and check-out process at the plant, because there is a great deal of security at the Sunshine plant given the nature of the work handling precious metals.

77. To get in and out of the plant all line employees must pass through metal detectors.

78. To help facilitate this process, Sunshine provides lockers so employees can leave things like work shoes and clothes inside the facility past the metal detectors.

79. Standard procedure for other female co-workers to obtain a locker was to notify security, which issued them a lock, at which time they could put a lock on any unassigned locker.

80. Ms. Evans duly notified the security department, and from an excess of caution, also notified the HR department. Though she felt it should not be necessary for her to notify the HR department, she wanted to ensure that the locker issue would not cause her any difficulties at work.

81. She received no response to her requests.

COMPLAINT (JURY DEMANDED)            8

82. She requested a meeting on this issue, as well as the name change issue, which was scheduled for Friday, November 14, 2014.

83. On or about that date, Ms. Evans met with a local HR representative and another HR representative from Defendant's corporate headquarters.

84. Ms. Evans was surprised to be informed that the meeting was convened to discuss a sexual harassment charge filed against her.

85. They told her that Frank Quinn, a production worker with whom had little to no contact, had filed a sexual harassment complaint against her.

86. She was told that Mr. Quinn had been handed a copy of the list of inappropriate questions that the co-worker had taken without permission.

87. She was also told that the co-worker had told Mr. Quinn that Ms. Evans had wanted to ask him some "questions" and that he should answer all the questions on the list.

88. Ms. Evans had made no such request.

89. Ms. Williams had indicated previously that she took "great joy" in making co-workers uncomfortable by discussing Ms. Evans' gender transition inappropriately, and she did so on this occasion to Mr. Quinn to make him uncomfortable

90. Ms. Williams succeeded so well in making Mr. Quinn uncomfortable that he filed this complaint against Ms. Evans.

91. The HR representatives told Ms. Evans that Mr. Quinn was offended by the contents of the list and had recently reported the incident to HR.

92. She was told that HR was investigating the list incident and that Mr. Quinn had filed a charge of sexual harassment against her.

93. They asked her several questions about the list incident.

94. They misgendered Ms. Evans throughout the meeting, calling her by incorrectly gendered name, title and pronouns, although she had explained many times to HR that it was important to call her by correctly gendered name, title and pronouns.

95. There was no discussion of the originally scheduled agenda regarding name change, and only a brief mention of locker assignment, when they asked if Ms. Evans would accept a locker in a single stall restroom instead of the lockers used by the other female employees.

96. On Tuesday November 18, 2014, Ms. Evans was terminated by the local HR representative.

97. He told her that the sole reason for her termination was that she had committed "sexual harassment," and her conduct violated Sunshine's written sexual harassment policy.

98. Sunshine never investigated Ms. Evans' complaints about harassment and hostile work environment because of her sex, nor did they take any action to address it after many months of complaints.

99. Nonetheless, it took very seriously Mr. Quinn's offense at seeing this list of inappropriate questions taken from Ms. Evans without permission, and his offense at being told a patently untrue story by an employee who wished to cause trouble for Ms. Evans because of her gender transition, to such an extent that it immediately conducted an investigation in four days, including a weekend, and terminated her, shortly after she made requests to change her name and use an appropriately gendered locker room.

100. Sunshine's purported nondiscriminatory rationale for Ms. Evans' termination—that she violated Sunshine's harassment policy when she allegedly directed coworker Williams to give coworker Quinn a list of "questions" asking Quinn about his alleged transition to female—is implausible, not worthy of credence, and not honestly asserted as a legitimate, non-discriminatory reason for termination.

101. Sunshine's purported nondiscriminatory rationale for Ms. Evans termination was based on sex and gender stereotypes and bias-based beliefs about transgender people, including Ms. Evans.

102. This disparate treatment in terminating Ms. Evans also constituted harassment, contributed to the hostile work environment, and was retaliatory in nature.

103. Sunshine's response to the purported "sexual harassment" incident was also inconsistent with its past treatment of sexual harassment in the workplace.

104. For instance, it was well known by the company's supervisors, managers and coworkers that supervisor Gene Haggelson and supervisor Bill Maddison repeatedly engaged in sexual harassment in the workplace.

105. In both cases, Sunshine ignored their conduct for months despite a handful of employees lodging multiple complaints against them.

106. Upon information and belief, no investigation was conducted of Mr. Maddison's conduct, and he was not terminated.

107. Upon information and belief, Mr. Haggelson was terminated after many months of extensive investigation.

108. Mr. Maddison was similarly situated to Plaintiff, in that he was at a similar level in the company and was accused of a violation of the same employer policy.

109. Mr. Haggelson was similarly situated to Plaintiff, in that he was at a similar level in the company at the time of the complaints against him, and he was accused of a violation of the same employer policy.

110. The very different treatment of Mr. Maddison and Mr. Haggelson demonstrates disparate treatment against Ms. Evans because of her sex.

111. Ms. Evans was told by HR that she could apply for unemployment benefits.

112. HR suggested that Sunshine would not oppose my request for unemployment benefits.

113. Nonetheless, Sunshine did oppose her unemployment benefits using this purported "sexual harassment" incident, which incident was a sham as well as discriminatory and retaliatory.

114. The opposition to her unemployment benefits constituted further discriminatory and retaliatory treatment because of sex.

115. The Idaho Department of Labor made a finding of "no misconduct" and issued unemployment benefits.

## CAUSES OF ACTION

### COUNT 1
### 42 U.S.C. § 2000e, et seq.
### Hostile Work Environment Because of Sex

116. Plaintiff Ms. Evans incorporates by reference paragraphs 1-115 as if fully set forth herein.

117. Ms. Rylie Evans is a member of a protected category with regard to sex.

118. Ms. Evans is and was qualified to perform the job for which she was employed by Defendant.

119. After Ms. Evans's transgender status was disclosed to her coworkers, supervisors, and managers, Defendant Sunshine's managers and employees instituted a campaign of harassment and discrimination on the basis of sex and sex stereotyping, including gender, gender expression, gender identity, and gender transition, and adopted adversarial attitudes and hostile demeanors. This harassment was frequent, severe and pervasive, physically threatening, and continued until Ms. Evans's constructive discharge by Defendant Sunshine.

120. Ms. Evans was targeted for harassment and subjected to a hostile work environment by managers and employees because of her sex and sex stereotyping, including gender, gender identity, gender expression, and gender transition.

121. The discriminatory acts involved the same type of employment actions, occurred frequently, were perpetuated and/or directed by the same core group of managers and employees, were egregious, numerous and concentrated, and formed part of the same hostile work environment, as detailed herein.

122. The discriminatory acts were unwelcome to Ms. Evans.

123. Discriminatory intimidation, ridicule, and insult permeated the work environment, and was sufficiently severe or pervasive to alter the conditions of Ms. Evans's employment and to create an abusive working environment, as detailed herein.

124. Defendant Sunshine's managers and employees made statements that demeaned Ms. Evans's sex, gender, gender identity, gender expression, and gender transition, as detailed herein.

125. Defendants' managers denied the legitimacy of Ms. Evans's female gender identity and feminine gender expression, and encouraged and/or failed to stop others under their direction from doing the same.

126. This hostile environment unreasonably interfered with Ms. Evans's ability to perform her job duties, by disrupting her relationship to Defendant Sunshine and its management, by the unreasonable criticism and scrutiny of Ms. Evans's gender which flowed directly from Defendant Sunshine's failure to take prompt and effective action to stop the hostile work environment, by Ms. Evans's need to spend many hours on otherwise unnecessary grievance processes and other means of seeking relief, and her reasonable fear for her safety, amongst other reasons, and created working conditions intolerable to a reasonable person, constituting constructive discharge.

127. The effects of the hostile environment alleged herein were felt by Ms. Evans daily. For instance, Ms. Evans felt humiliation and despair as a result of her reasonable fear of

continued harassment at any moment, her being referred to continually and intentionally by the wrong name and wrong gender references, her unreasonably not being allowed to take breaks with her and the hostility she encountered when using restrooms appropriate to her gender while at work

128. Many events contributing to this hostile work environment occurred within the 300-day period prior to Ms. Evans's first EEOC charge.

129. Ms. Evans perceived the working environment to be abusive or hostile.

130. A reasonable woman in Ms. Evans's circumstances would consider the working environment to be abusive or hostile.

131. Defendant Sunshine's actions occurred because of Ms. Evans's sex, in that she was female, but Defendant Sunshine regarded her as male.

132. She would not have been the object of harassment but for her gender.

133. Defendant Sunshine was on notice of the hostile work environment, including actual notice by means of complaints made by Ms. Evans Defendant as detailed herein, by means of Ms. Evans's EEOC charge filed during their employment, and vicariously and constructively by means of the acts perpetrated by Ms. Evans's direct supervisors and managers, as detailed herein.

134. Defendant Sunshine did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

135. As a direct and proximate result of Defendant Sunshine's unlawful discrimination, Ms. Evans incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to her professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Sunshine's unlawful hostile work environment.

## COUNT 2
## 42 U.S.C. § 2000e, et seq.
### Retaliation

136. Plaintiff Ms. Evans incorporates by reference paragraphs 1-115 as if fully set forth herein.

137. The effect of Defendant Sunshine's acts complained of above was to deprive Ms. Evans of equal employment opportunities as an employee because of retaliation for her complaints of discrimination in violation of Title VII and Title I of the Civil Rights Act of 1991.

138. By complaining to Defendant Sunshine and Defendant Sunshine's managers about the discriminatory practices and hostile work environment described herein, and opposing said practices and hostile work environment directed at herself, Ms. Evans engaged in activities protected by Title VII.

139. Ms. Evans's exercise of protected rights was known to Defendant Sunshine, because the complaints were made to Defendant Sunshine during her employment.

140. The actions taken against Ms. Evans would dissuade a reasonable employee from making or supporting a complaint of discrimination.

141. By engaging in the conduct described above, Defendant Sunshine intentionally retaliated against Ms. Evans with malice or reckless indifference to Ms. Evans's federally protected rights to oppose practices that are prohibited by Title VII.

142. As a direct and proximate result of Defendant Sunshine's unlawful retaliation, Ms. Evans has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

## COUNT 3
## 42 U.S.C. § 2000e, et seq.
### Termination

143. Plaintiff Ms. Evans incorporates by reference paragraphs 1-115 as if fully set forth herein.

144. Defendant Sunshine terminated Ms. Evans's because of sex, sex stereotyping, gender, gender expression, gender identity and/or gender transition.

145. As a direct and proximate result of Defendant Sunshine's illegal discharge of Ms. Evans, Ms. Evans has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, damage to her professional reputation, and other pecuniary and non-pecuniary losses.

## JURY DEMAND

146. Plaintiffs hereby demand a trial by jury of all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ms. Rylie Evans respectfully requests that this Court:

A. Declare that the acts, practices, and omissions complained of herein are unlawful and violate Title VII;

B. Permanently enjoin Defendant Sunshine, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against employees who are transgender and/or who have undergone or are undergoing a gender transition, or who are associated with employees who are transgender and/or have undergone or are undergoing a gender transition;

C. Order Defendant Sunshine to institute and carry out policies, practices, programs, and training which provide equal employment opportunities for employees who are transgender, have undergone a gender transition, or are undergoing a gender transition, and which eradicate the effects of Defendant Sunshine's past and present unlawful employment practices;

D. Order other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

E. Direct Defendant Sunshine to pay Ms. Evans for past and future pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs;

147. Direct Defendant Sunshine to pay Ms. Evans for past and future non-pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs, including humiliation, loss of enjoyment of life, damage to her professional reputation, and other non-pecuniary losses in an amount to be determined at trial;

F. Direct Defendant Sunshine to pay Ms. Evans punitive and special damages for its malicious or reckless conduct described in the foregoing paragraphs, in an amount to be determined at trial;

G. Award Ms. Evans attorneys' fees, costs, and disbursements as provided by law; and

H. Award such additional relief as justice may require.

Dated: August 14, 2018

Respectfully submitted,

_____
Rylie Evans
9612 East Dalton Road
Spokane, WA 99206
revans813@gmail.com
509-491-0946
Pro Se

F. Direct Defendant Sunshine to pay Ms. Evans punitive and special damages for its malicious or reckless conduct described in the foregoing paragraphs, in an amount to be determined at trial;

G. Award Ms. Evans attorneys' fees, costs, and disbursements as provided by law; and

H. Award such additional relief as justice may require.

Dated: August 14, 2018

Respectfully submitted,

_____
Rylie Evans
4150 W Fort George Wright Dr
A202
Spokane, WA 99224
revans813@gmail.com
509-491-0946
Pro Se